JAMES LYNCH, APPELLANT, V. METROPOLITAN UTILITIES DIS-
TRICT, A CORPORATION, ET AL., APPELLEES.

218 N. W. 2d 546

Filed May 23, 1974. No. 39290.

Richard J. Spethman and Renne Edmunds, for appellant.

Cecil S. Brubaker, W. L. Strong, Merlin E. Remmenga, Kutak, Rock, Cohen, Campbell, Garfinkle & Woodward, Herbert M. Fitle, Kent N. Whinnery, and Robert J. Hamer, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, MC-COWN, NEWTON, CLINTON, and BRODKEY, JJ.

McCOWN, J.

This is an action by plaintiff, as representative of a class, against the Metropolitan Utilities District, Ne-

braska Methodist Hospital, and the City of Omaha, seeking to quiet title to certain real property in the City of Omaha, and to obtain for the city a portion of the proceeds of the sale of certain real estate similarly acquired. The District Court quieted the title to certain portions of the property in the defendant, Nebraska Methodist Hospital; quieted the title to the remaining property in the defendant, Metropolitan Utilities District; and dismissed plaintiff's petition and the City's cross-petition. Plaintiff has appealed.

All the facts are stipulated. Hereafter, Metropolitan Utilities District will be referred to as MUD; the Nebraska Methodist Hospital, as Hospital; and the City of Omaha, as City. The property in question here, a gas plant, was acquired by the City between 1918 and 1920, by eminent domain proceedings from the Omaha Gas Company, a private utility. The City issued $5 million in bonds to pay the condemnation award, and on July 1, 1920, the Omaha Gas Company executed and delivered a quit claim deed to the City covering the gas plant property.

Chapter 187, Laws 1919, provided that upon acquisition of the gas plant by the City, the Metropolitan Water District should immediately take over control and have "supreme and paramount authority" as to the possession and operation of such a gas plant. That act also provided that the funds arising from the operation of the gas plant, over and above certain operating expenses, were to be set apart as a sinking fund to be first applied in payment of interest and principal of any bonds issued for the acquisition of the gas plant. Upon its acquisition by the City, the gas plant was immediately taken over by the Metropolitan Water District.

In 1921, MUD was created by the Legislature and became the successor of the Metropolitan Water District. Chapter 111, Laws 1921, extended all the powers

which had been conferred upon a metropolitan water district to apply to gas plants and also vested all the powers, obligations, rights, and authority formerly exercised by the water district in MUD.

The interest and principal of the bonds issued by the City for the acquisition of the gas plant property were paid in full by MUD, entirely from funds from the operation of the gas plant. The bonds were liquidated on January 23, 1956.

Under MUD operation, various additions and extensions were made to the gas plant from time to time, some of which were constructed and located on adjoining land, which had been acquired and held by MUD in its own name.

Pursuant to resolution, the City executed a quit claim deed on September 4, 1968, conveying to MUD any interest of the City in all the parcels constituting any part of the gas plant, including the real estate originally acquired in the condemnation action of 1920, as well as all real estate adjoining it which had been later acquired and held by MUD in its own name. The quit claim deed reserved "any claim the City may have as against the proceeds of the sale of any of said property by reason of any interest said City may have in said properties * * *." In making the quit claim deed to MUD, the City did not comply with the provisions of its charter dealing with the sale and disposition of unneeded real property. The City has not received any payment from the sale of property to the Hospital to be referred to later. Proceeds of that sale have been retained and are held by MUD.

By resolution of the Board of Directors of MUD, dated November 5, 1969, a portion of the original gas plant property, together with real property adjoining it held by MUD in its own name, was declared surplus and offered for sale. MUD advertised for and received sealed bids on the property. Original bids ranging

from $145,000 to approximately $181,000 were rejected. A subsequent bid of $200,000 by the defendant, Hospital, was also rejected. Another offer of $275,000 was accepted by MUD and the surplus property was conveyed by MUD to the Hospital by warranty deed dated June 25, 1970. The parties have stipulated as to the proportionate values attributable to the original gas plant property.

In 1972, the Legislature enacted section 14-1115, R. S. Supp., 1972, effective on July 6, 1972. That statute provides: "Whenever any of the property of a utility under the control of a metropolitan utilities district, whether real property or personal property, shall no longer be required for the operation of such utility, the district may sell and convey such surplus property, whether such property was acquired directly by the district or as a part of the utility plant or system acquired by the metropolitan city or any municipality or other political subdivision constituting a part of the district. Proceeds of the sale of such surplus property shall be credited to the utility of which such property was a part, or, where funds of more than one utility have been invested in property involved in a consolidated operation of the district, proceeds of such sale shall be apportioned among the utilities involved in such consolidated operation upon some reasonable basis determined by the board of directors of the district."

The surplus property originally conveyed by MUD to the Hospital, by warranty deed in 1970, was again conveyed pursuant to resolution from MUD to the Hospital by warranty deed dated September 8, 1972.

Plaintiff commenced this action against the defendants, MUD and Hospital, on January 22, 1971. Thereafter, the City became a party defendant. On August 2, 1973, the trial court entered its judgment and decree dismissing plaintiff's petition and the cross-petition of the City, and quieting title in the Hospital as to the land conveyed to

it by MUD; and in the defendant, MUD, as to all other property.

Some relevant background history is of importance. MUD "is a municipal corporation created by statute to take over, control and operate the water-plant, formerly owned by the city of Omaha, and certain other public utilities." Keystone Investment Co. v. Metropolitan Utilities District, 113 Neb. 132, 202 N. W. 416. MUD's predecessor, a metropolitan water district, was a body corporate with all the usual powers of a corporation for public purposes, including the power to purchase, hold, and sell personal property and real estate. It had the sole management and control of its assets, including all waterworks property "real and personal, now or hereafter owned by said metropolitan city * * *." See § 14-1002, R. R. S. 1943.

In 1921, the Metropolitan Utilities District, as a separate and independent entity, became the successor of the Metropolitan Water District and succeeded to the property and powers and assumed the obligations of the water district. All the powers conferred upon metropolitan water districts were extended to gas plants and all such powers, obligations, rights, and authority became and were vested in MUD. See Laws 1921, chapter 111, sections 2 and 3, now §§ 14-1102 and 14-1103, R. R. S. 1943.

It is important to note also that the quit claim deed from the City to MUD in 1968 did not alter or affect the public purpose for which the properties were held. The transfer of bare legal title would have no effect upon the public for whom the property is held, whether they were in the class of taxpayers or of rate payers, so long as the property remained dedicated to the purposes of operating a gas plant.

Obviously, the statutory intermingling of rights, powers, and title as between MUD and the City created uncertainty and ambiguity as to the authority of MUD to sell and convey surplus property formerly acquired in the name of the City, but held and used by MUD in the opera-

tion of the gas plant. Section 14-1115, R. S. Supp., 1972, was adopted by the Legislature to remove any such uncertainty and ambiguity. The statement of purpose establishes the curative nature of the statute. The statute provides: "Whenever any of the property of a utility under the control of a metropolitan utilities district, whether real property or personal property, shall no longer be required for the operation of such utility, the district may sell and convey such surplus property, whether such property was acquired directly by the district or as a part of the utility plant or system acquired by the metropolitan city or any municipality or other political subdivision constituting a part of the district."

The statute also provides that the proceeds of such sale were to be credited to the utility of which such property was a part, and by that provision it effectively and practically preserved the purpose for which the property was held.

This court has on many occasions affirmed the principle that municipal corporations are creatures of the Legislature and that the Legislature has plenary power over them. In City of Millard v. City of Omaha, 185 Neb. 617, 177 N. W. 2d 576, we again confirmed that principle and quoted once more with approval from Hunter v. City of Pittsburgh, 207 U. S. 161, 28 S. Ct. 40, 52 L. Ed. 151: "Municipal corporations are political subdivisions of the State, created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them. For the purpose of executing these powers properly and efficiently they usually are given the power to acquire, hold, and manage personal and real property. The number, nature and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the State. Neither their charters, nor any law conferring governmental powers, or vesting in them property to be used for governmental purposes, or authorizing them to hold or manage such property, or

exempting them from taxation upon it, constitutes a contract with the State within the meaning of the Federal Constitution. The State, therefore, at its pleasure may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the State is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the Constitution of the United States."

Section 14-1115, R. S. Supp., 1972, effectively removed from a metropolitan city whatever right it may have had to sell and convey the utility property described in the statute, and transferred that right to the metropolitan utilities district. That statute also effectively determined the manner and method of disposition of the proceeds of any such sale and conveyance.

The legislative history of the statute establishes beyond question its curative nature. "Curative statutes, by reason of their remedial and retrospective nature, are applicable not only to past transactions generally, but also to cases pending in the trial court." Hargleroad Bulk Carriers, Inc. v. Ruan Transp. Corp., 173 Neb. 151, 112 N. W. 2d 743. See, also, City of Fremont v. Dodge County, 130 Neb. 856, 266 N. W. 771.

Even if the statute were to be interpreted as prospective only, the result here would be the same. After the effective date of section 14-1115, R. S. Supp., 1972, MUD again conveyed the property to the Hospital and the proceeds of the sale are still held by MUD. Under such circumstances, whether the original 1968 quit claim deed from the City to MUD was valid or void is immaterial. Although there are reasonable grounds upon which to argue either result, the statute has removed the neces-

sity of making that decision. The passage of the statute also removes the other issues raised by the plaintiff.

The judgment of the District Court was correct and is affirmed.

AFFIRMED.

BOSLAUGH, J., concurring.

I concur in the result in this case upon the ground the transfer of the bare legal title had no effect upon the public for whose benefit the property is held.

Hunter v. City of Pittsburgh, 207 U. S. 161, 28 S. Ct. 40, 52 L. Ed. 151, was concerned with property *used for governmental purposes* involved in the consolidation of two cities. The opinion distinguished between property held for governmental purposes and property held for proprietary use in this manner: "It will be observed that in describing the absolute power of the State over the property of municipal corporations we have not extended it beyond the property held and used for governmental purposes. Such corporations are sometimes authorized to hold and do hold property for the same purposes that property is held by private corporations or individuals. The distinction between property owned by municipal corporations in their public and governmental capacity and that owned by them in their private capacity, though difficult to define, has been approved by many of the state courts (1 Dillon, Municipal Corporations, 4th ed., sections 66 to 66a, inclusive, and cases cited in note to 48 L. R. A. 465), and it has been held that as to the latter class of property the legislature is not omnipotent."

A municipality, in the operation of a public utility, acts in its private and proprietary capacity, and such property is generally not subject to appropriation or complete control by the state except by the exercise of eminent domain. 2 McQuillin, Municipal Corporations (3d Ed.), § 4.132, p. 215.

CLINTON, J., joins in this concurrence.